**IN THE COURT OF APPEALS OF IOWA**

No. 13-1196
Filed January 14, 2015

**RICK CARTER,**
     Plaintiff-Appellant,

**vs.**

**LEE COUNTY, IOWA,**
     Defendant-Appellee.
_____

Appeal from the Iowa District Court for Lee County (South), Mary Ann
Brown, Judge.

A fired employee appeals the district court's grant of Lee County's motion
for judgment notwithstanding the verdict. **AFFIRMED**.

Curtis Dial of Law Office of Curtis Dial, Keokuk, for appellant.

Steven E. Ort of Bell, Ort & Liechty, New London, for appellee.

Heard by Danilson, C.J., and Doyle and Tabor, JJ.

**TABOR, J.**

Rick Carter envisioned himself a whistleblower, revealing to the public what he believed to be Lee County's "troubling pattern of irresponsible money management" and health and safety violations. The Lee County supervisors viewed Carter as an insubordinate employee who demonstrated "a proclivity to ad hominem attacks on any one disagreeing with him." The supervisors fired Carter and Carter sued the county under Iowa Code section 70A.29 (2011), a statute prohibiting reprisals against employees of political subdivisions who disclose negative information.

The suit went to trial and a jury awarded Carter a total of $186,000 in damages. The county filed motions for a judgment notwithstanding the verdict (JNOV) and a new trial, alleging Carter failed to present sufficient evidence to support the jury's finding he engaged in protected activity that triggered the termination of his employment. The district court granted the county's JNOV motion.

On appeal, Carter urges us to overturn the JNOV because the district court erroneously interpreted the whistleblower statute and wrongly viewed the evidence in the light most favorable to the county. Carter contends we should reinstate the verdict because it was supported by substantial evidence.

We conclude the district court properly interpreted the whistleblower statute and viewed the evidence in the light most favorable to Carter. Applying those legal standards, the district court correctly determined no reasonable jury could have found Carter engaged in protected activity. Accordingly, we affirm the district court's grant of JNOV.

## I. Standard of Review

A motion for JNOV provides the district court with a second chance to correct any error in its earlier decision to deny a motion for directed verdict. *See* Iowa R. Civ. P. 1.1003(2); *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010). "When the district court considers a motion for JNOV, it must view the evidence in the light most favorable to the party against whom the motion is made." *Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa 1998).

We review a JNOV ruling for legal error. Iowa R. App. P. 6.907; *Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 18 (Iowa 2014). We consider the evidence in the same manner as the district court did, asking whether the plaintiff offered sufficient evidence to generate a jury question. *Schlegel*, 585 N.W.2d at 221. "To justify submitting the case to the jury, substantial evidence must support each element of the plaintiff's claim." *Smith*, 851 N.W.2d at 18. "Substantial evidence" exists if "reasonable minds would accept the evidence as adequate to reach the same findings." *Id.*; *Schlegel*, 585 N.W.2d at 221. We take "into consideration every legitimate inference that may fairly and reasonably be made." *Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 347 (Iowa 1999).

## II. Background Facts and Proceedings

Viewing the evidence in the light most favorable to Carter, including all reasonable inferences, the jury could have found the following facts based upon Carter's own testimony.

Carter began his employment as maintenance director for Lee County in 2007. He reported to Larry Kruse, a member of the county's board of supervisors and its liaison to the maintenance department. If Carter had concerns regarding the maintenance department, he "would question Kruse and, usually, [Kruse] would have [him] take it to the Board."

In 2008, the county began the project of building a new jail, and Kruse "brought in" Carter to oversee the contractors and "make sure they're doing their job right and not . . . taking advantage of the county." Carter also testified his role included overseeing outside bids for the jail project such as electrical, air conditioning, and plumbing contractors. The county hired John Hansen, owner of the construction management firm Midwest Construction Consultants, to consult on the jail project. Carter testified Hansen and Kruse showed him diagrams and blueprints created for constructing the jail and asked for his input.

At some point, Carter learned the jail plans called for a certain-sized pipe for the plumbing, and Carter was concerned the specified size was too narrow. Carter spoke with a master plumber who recommended a larger pipe be used, and Carter ultimately took his concerns regarding the pipe size to Kruse. Kruse told him his concerns were "ridiculous," and Carter asked him if he could present the issue at the supervisors' public meeting. Kruse told him he "better not" because "it would interfere with the jail."

Carter presented his concerns at the public meeting anyway, in approximately January 2008. Carter testified he told Kruse "it was something I felt the public should know." Present at the meeting were the board members, the county sheriff, the county engineer, and other county department heads.

Carter recalled that some county supervisors were supportive of Carter's concerns, but Kruse "was mad" and "didn't want anything to do with it." Ultimately, the board agreed with Carter and chose a larger-sized pipe for the project.

During the jail's construction process, Carter voiced additional concerns to Kruse and other board members. Because Kruse and others continued to disregard Carter's concerns, Carter continued to air them at public board meetings. Several concerns he raised at meetings were addressed by the board and ultimately changed, including how water would be supplied to the jail and the need for a new leach field for the sewer system. Carter testified other concerns he voiced were not resolved as he would have liked or not addressed at all, such as concerns regarding the workmanship by certain contractors in the jail construction. Carter also expressed concerns the county was hiring contractors to do work his department could do for no extra cost.

Carter, as the head of the maintenance department, was in charge of the department's funds. He believed some money from his budget was being put toward construction of the jail because Kruse would ask him "to sign off on a hundred twenty or a hundred sixty thousand dollars' worth of receipts." Carter refused because he did not know what the receipts were for or from where they came. Carter raised the issue with the board but was told to "just sign them off this time, . . . and next time don't do it."

Carter continued to present concerns he had with individual supervisors and his incredulity of the board's response at public board meetings. When asked how many times he did so, he replied: "Too many to even count." Carter

believed the board and others were "working together against the public taxpayer" and were "trying to hide all the mistakes that came up and not to address them."

Carter acknowledged never taking his complaints regarding the board's alleged wrongdoing to other officials. When asked on cross-examination to whom he blew the whistle, he admitted he did not report his concerns about safety and health violations to agencies such as the Occupational Health and Safety Administration or the Department of Natural Resources. Instead he testified that he "whistled all the goddamn day to the Board and everybody that would listen."

In June 2010, Carter received a written reprimand from the supervisors for his actions during a board meeting. The reprimand detailed Carter's conduct in attending a board workshop with the expressed purpose to discredit one of the county's contractors on the jail expansion project. The reprimand stated: "Your job as Maintenance Director is to work as part of the team to get the jail project completed, not to discredit a specific contractor." The reprimand also stated Carter had "been orally counseled when [he had] previously brought things to the Board without first discussing them with appropriate team members to follow proper procedures before bringing things to the Board in a public meeting."

In August 2010, Kruse reviewed Carter's work performance. Kruse stated on the evaluation:

> [Carter] has an aptitude for analyzing technical issues, but is very often ineffective as a leader, communicator and manager. Due to these latter deficiencies, [Carter's] performance is substandard and unacceptable. While he has the skill necessary to evaluate and potentially solve problems, [Carter's] judgment when

dealing with key employees, contractors, the [board] and other stakeholders has been poor . . . . While it is [Carter's] duty to ensure compliance with public requirements, he must do so in a thoughtful and tactful manner which does not create an atmosphere of distrust, resentment, suspicion and hostility. Publically "calling out" contractors in a public workshop, especially when appropriate corrective action is already being taken . . . is not an appropriate managerial method. Because such actions led to threats of legal action against the [county], corrective action on the part of the [board] was required.

. . . .

. . . [Carter] has been dismissive of directives he has received and his failure to follow through on important issues constitutes insubordination.

Concerning Carter's ability to be "an effective team player" and to demonstrate "commitment to a harmonious working environment with co-workers and the public," Kruse stated:

[Carter] seems to have a personal conflict with [b]oard members and does very little to moderate his tone and his positions in order to show respect for differing viewpoints. While it is important for [Carter] to give his opinions, so that the [board has] the information they need to act in the public interest, it is critical that [Carter] exercise common sense and courtesy, especially when the public is present. It is not appropriate to air unvarnished opinions or concerns about a contractor in a sort of "ambush" fashion. . . . [Carter's] purported concern about certain contractors goes beyond concern for the public and instead sounds very much like a personal vendetta. [Carter's] gratuitous remarks in the local newspapers were ill-considered and inappropriate.

Rather than work to resolve conflicts in a professional manner, [Carter] unnecessarily picks public fights over constructions issues . . . .

. . . .

The [board] is working toward a professional style of government and seeks to avoid turning every public project into a political struggle between the various players; it appears that [Carter] is not on board with that concept and is instead determined to behave as he sees fit. [Carter] is of course encouraged to give his opinion, but this behavior must stop.

In early November 2010, Kruse and Rick Larkin, chair of the county supervisors, wrote a letter to inform Carter the board would vote on his continued

employment at an upcoming meeting. The letter gave numerous reasons Carter faced disciplinary action up to termination, including that the supervisors had "lost faith in [his] ability to communicate effectively with the board regarding ongoing matters" and that other

> members of [c]ounty government to whom [he is] to provide services do not feel that [his] communication with them has been adequate, and they have been disappointed in [his] handling of projects which involve them. This is not to suggest that some major projects were not ultimately completed, but rather that [his] lack of tact and listening skills caused hard feelings and made the projects more complicated and difficult than they should have been.

The board terminated Carter's employment on November 16, 2010, following a four-to-one vote.

In May 2011, Carter filed his petition at law against the county, asserting he was wrongfully discharged from employment, and the termination violated the state whistleblower statute, as set forth in Iowa Code section 70A.29(1) (2011).[1] The district court held a trial in February 2013. At the close of Carter's case, the county moved for a directed verdict, arguing Carter failed to establish he was engaged in protected activity at the time he made his asserted disclosures. The county contended Carter only aired his concerns to the supervisors, to whom he was required to report, and therefore did not do any whistleblowing to afford him the protections of the whistleblower statute. The court denied the motion for

---

[1] That provisions states in pertinent part:

> A person shall not discharge an employee from . . . a position in employment by a political subdivision of this state as a reprisal for a disclosure of any information by that employee to . . . an official of that political subdivision . . . or for a disclosure of information to any other public official or law enforcement agency if the employee reasonably believes the information evidences a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety. This section does not apply if the disclosure of the information is prohibited by statute.

Iowa Code § 70A.29(1).

directed verdict, saying it "suppose[d] there's a scintilla of evidence supporting" Carter's claim.

In the defense case, Kruse and several other witnesses testified for the county. At the end of the trial, the county renewed its motion for directed verdict. The district court stated, "in viewing the evidence in the light most favorable to the Plaintiff," it could not find any evidence Lee County violated the law or was responsible for any mismanagement or gross abuse of funds or for any specific danger to public health or safety. But the court noted the existence of actual misdeeds by the county was not the "sole question" and the jury would be asked if Carter "reasonably believed that any of those events had occurred" concerning the management of Lee County. The court found Carter had established by "a razor thin level" a fact question for the jury on his reasonable belief.

After closing arguments, the court instructed the jury on the liability issue as follows:

> In order for [Carter] to recover against [the county] on his claim of wrongful termination, [Carter] must prove all of the following propositions:
> 1. [Carter] was employed by [the county] and was terminated from said employment by [the county] on November 16, 2010.
> 2. [Carter] reported certain information to a public official or law enforcement agency.
> 3. [Carter] reasonably believed the information was evidence of [the county] committing a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or of a substantial and specific danger to public health or safety.
> 4. The fact that [Carter] reported said information to a public official or law enforcement agency was the determining factor in the [the county's] decision to terminate [Carter's] employment.
> 5. Said termination was a proximate cause of damage to the [Carter].
> 6. The nature and extent of his damages.
> If [Carter] has failed to prove any of these propositions, he is not entitled to damages under this claim. If [Carter] has proved all

of these propositions, he is entitled to damages in some amount under this claim.

The verdict forms required the jury to answer these questions: (1) "Was [Carter] reasonable in believing that a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial or specific danger to public health or safety existed or had occurred?"; (2) "Did [Carter] make a report to a public official or law enforcement agency official of evidence of a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial or specific danger to public health or safety?"; (3) "Was the report made by [Carter] the determining factor for a majority of the [supervisors'] decision to terminate his employment?"; and (4) "Was the [county's] termination of [Carter's] employment a proximate cause of damages to [Carter]?". The jury checked "Yes" as to each question and found Carter sustained damages in the amount of $186,000.

The county subsequently filed motions for a JNOV and a new trial. It asserted Carter "failed to present sufficient evidence to establish he was engaged in a protected activity" and that the board "had any knowledge or reason to believe Carter was engaged in a protected activity." Carter resisted, arguing the only challenges preserved were those previously urged by the county concerning the sufficiency of the evidence and whether the whistleblower statute allowed Carter to report his allegations of wrongdoing to the persons he was accusing of wrongdoing. Carter argued the county failed to preserve any other claims for the court's review because they were not raised in its directed verdict motions. Additionally, Carter argued evidence supported the jury's verdict.

Following a hearing, the district court granted the county's JNOV motion. The court described Carter's allegations against the county in his direct testimony as "moving targets" and found it "difficult to pinpoint what specific wrongs he claimed occurred." So instead the court focused on Carter's cross-examination testimony where the county's attorney tried to tease out "an itemization of the purported wrongdoings."

Using that framework, the court concluded Carter

failed to offer any credible evidence of any wrong of [the county] that would rise to the level that it justified having someone "blow the whistle" on them. But, more importantly, [Carter] has offered no evidence that would support his assertion that he was reasonable in believing such a violation had taken place. He has offered no objective evidence that a reasonable person would believe that such a level of wrongdoing had been perpetrated by [the county's] officials. Instead, [Carter] has established that he misunderstood several of the actions taken by the [board] and that he disagreed with their actions. Merely disagreeing with their actions does not rise to the level of proving that the actions of [the county] would reasonably be perceived as some type of wrongdoing.

The court further found:

[W]hen viewing the evidence in the light most favorable to [Carter], all that was proven at trial was that [Carter] disagreed with his employer's choices and decisions and that he told them and other county officials of this. There was no evidence presented that a reasonable mind would accept to establish that there was a reasonable basis for [Carter] believing the county committed any wrong as envisioned in Iowa Code Section 70A.29. In addition, everything that [Carter] reported was either already publicly known or at least well known to those involved. It must be kept in mind that this is not a First Amendment case wherein [Carter] is claiming retaliation for exercising his right to freedom of speech. In order to recover, [Carter] must present evidence on the factors set forth in Iowa Code Section 70A.29.

Because "it is absolutely clear to an impartial viewer that [Carter] failed to carry his burden to generate a jury question," the court reassessed its denial of the

county's motion for directed verdict at the close of the evidence: "This case should not have been submitted to the jury."

Carter now appeals. He contends the district court wrongly applied an objective standard of reasonable belief. Additionally, he asserts the court viewed the evidence in the light most favorable to the county because it "unjustifiably selected evidence against [Carter]" and "added extralegal elements to the whistleblower statute." He argues substantial evidence supports the verdict, and requests attorney fees. We address each argument in turn.

### III. Analysis of Whistleblowing Claim

In Iowa, employment generally is at will, meaning either party may end the employer-employee relationship at any time for any reason or for "no reason at all." *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 300 (Iowa 2013). But an employee working at will may sue for wrongful discharge when the employer's reasons for terminating the employment violate a clearly defined and well-recognized public policy. *Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 109 (Iowa 2011). Whistleblowing is an example of one such public policy. *Dorshkind*, 835 N.W.2d at 300.

> An employee seeking protection under the public-policy exception in his or her wrongful-discharge claim must prove the following elements:
> (1) the existence of a clearly defined and well-recognized public policy that protects the employee's activity; (2) this public policy would be undermined by the employee's discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason the employer discharged the employee; and (4) the employer had no overriding business justification for the discharge.

*Id.* (internal citations and quotation marks omitted). "If the discharged employee successfully establishes each of these elements, he or she is entitled to recover both personal injury and property damage." *Id.* (internal citations and quotation marks omitted). "The first two elements constitute questions of law to be determined by the court." *Id.* Elements three and four are factual questions to be resolved by the jury if the plaintiff presents sufficient evidence. *See id.*

At issue here is element three—whether Carter engaged in protected activity. In its introductory instruction, the district court informed the jury that Carter was alleging the county terminated his employment "because he had disclosed information to a public official or law enforcement agency that he reasonably believed was evidence of a violation of a law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public safety or health." *See* Iowa Code § 70A.29(1). The instruction continued: "If this was the reason he was terminated it was against public policy." A later instruction placed the burden on Carter to establish, among other things, that he "reported certain information to a public official or law enforcement agency," and he "reasonably believed the information was evidence of [the county] committing a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or of a substantial and specific danger to public health or safety."

In granting the JNOV, the district court decided the phrase "reasonably believed" in section 70A.29(1) reflected an objective standard, and thus the court was required to determine "whether a reasonably prudent person would believe that the information was evidence of some wrong on the part of [the county]."

The court ultimately held Carter's disagreement with the actions of his employer, the Lee County Board of Supervisors, did not rise to the level of proving his reasonable belief that the county was engaging in wrongdoing. The court further held "all of the 'disclosures' that he made to any official were already known by that official and others in some form. The 'disclosures' that he made were really [Carter's] rejection of the decisions or actions taken by his employer."

On appeal, Carter takes issue with the district court's interpretation of the phrase "reasonably believed" as an objective standard. Citing *Teachout v. Forest City Community School District*, 584 N.W.2d 296, 301 (Iowa 1998), Carter contends a whistleblower need only show he had "a subjective good-faith belief" his employer was engaging in wrongdoing and he intended to file a report to enjoy the protection of the statute. The county distinguishes *Teachout* as specific to child abuse reports under Iowa Code section 232.73, as opposed to disclosures of information that an employee reasonably believes evidences wrongdoing under section 70A.29. We agree with the county that *Teachout* does not dictate a solely subjective standard here.

Section 70A.29 requires proof the employee "reasonably believes" the information being disclosed is evidence of wrongdoing; the provision embraces both a subjective and an objective standard. *See O'Brien v. Emp't Appeal Bd.*, 494 N.W.2d 660, 662 (Iowa 1993) (citing 82 Am.Jur.2d *Wrongful Discharge* § 60 (1992) (the reasonableness of the whistleblower's belief that illegal activity is occurring is measured by a "good faith" standard)). So while Carter's subjective understanding and intent are relevant, the key question is whether a reasonable person in his circumstances would have believed the disclosed information

revealed mismanagement, gross abuse of funds, or other comparable wrongdoing by Lee County. If Carter's beliefs, however sincere, were objectively unreasonable, his actions were not protected activity. The district court did not misinterpret the language of the whistleblower statute.

Carter further attacks the district court's JNOV ruling by contending the court viewed the evidence in the light most favorable to the county because it "unjustifiably adopted" the county's version of disputed facts and "ignored evidence which tended to support" Carter's position. Carter claims the district court drew on the county's cross-examination of him as its "exclusive source of facts." Carter misconstrues the court's reasoning. The court expressly stated it was viewing the evidence in the light most favorable to Carter. But the court could not decipher from Carter's direct examination what information he presented to public officials or law enforcement which evidenced the county's alleged wrongdoings; the court called Carter's allegations "moving targets." The court considered the county's cross-examination of Carter to be a more concise itemization of what he asserted the county had done wrong and relied on that testimony to analyze Carter's whistleblower protection.[2] We see no error in the court's reliance on Carter's cross-examination testimony.

Carter also asserts the judge added "extralegal" elements to the whistleblower statute; including the requirement that the county "be unaware of

[2] According to the district court's JNOV ruling, the "wrongs" identified by Carter included: (1) problems with the jail sewer system, (2) the HVAC maintenance contract with Vison & Sill; (3) the supervisors' alleged request that he prepare false reports concerning the Department of Human Services/Iowa Workforce Development project; (4) improper spending from the maintenance budget; and (5) reporting of contractor errors in the jail project.

the wrongdoing" it had engaged in. In discussing Carter's testimony concerning the jail project, the court concluded Carter did not "disclose any information that was not already known to those involved." We are not persuaded that this statement by the district court added an element to section 70A.29.

The whistleblower provision required Carter to prove his discharge from employment was in reprisal for his *disclosure* of information either to public officials or to a law enforcement agency that he reasonably believed to be evidence of wrongdoing by the county. *See* Iowa Code § 70A.29(1). The term "disclosure" was not defined by the legislature. Courts may consult the dictionary to give words their plain and ordinary meaning in the absence of a legislative definition. *See* Iowa Code § 4.1(38); *Lauridsen v. City of Okoboji Bd. of Adjustment*, 554 N.W.2d 541, 544 (Iowa 1996). The common meaning of "disclose" is "to expose to view, as by removing a cover; uncover" or "to make known, divulge." The American Heritage Dictionary 402 (2d College ed. 1985).

As the district court determined, during the trial Carter did not identify any information he had provided to the county supervisors or the sheriff that was previously unknown to them.[3] Because Carter's complaints were familiar to the supervisors and the sheriff before Carter aired them at the public meetings,

---

[3] Federal courts have interpreted the Whistleblower Protection Act (WPA) to exclude reports made to the wrongdoer, reasoning the statutory term "disclosure" meant to reveal something hidden or unknown. *See Hudson v. O'Brien*, ___ S.W.3d ___, ___, 2014 WL 5394923, at *4 (Mo. Ct. App. 2014). But "recent amendments to the WPA have abrogated the federal courts' interpretation of the term 'disclosure.' *See* 5 U.S.C. § 2302(8)(f)(1) (Supp. 2014) ('A disclosure shall not be excluded from [protection] because . . . the disclosure was made to a supervisor or to a person who participated in an activity that the employee . . . reasonably believed to be covered by [the statute or] the disclosure revealed information that had been previously disclosed')." *Id*. Prior federal case law and recent congressional amendments both may be persuasive, but are not binding authority when we endeavor to interpret our state statute.

Carter failed to prove he exposed adverse information within the meaning of the whistleblower statute. *See Obst v. Microtron, Inc.*, 614 N.W.2d 196, 203 (Minn. 2000) (holding that while previous knowledge by the employer would not always preclude liability under the whistleblower statute, employee was not whistleblower when content of reports was widely known and acknowledged). As the county argues on appeal: "The only thing Carter was doing was making his views and disagreements with the Board known to the public." The legislature did not include the public in the list of entities to whom wrongdoing may be reported to obtain whistleblower protection. Iowa Code § 70.A29; *cf. Hegeman v. Kelch*, 666 N.W.2d 531, 533 (Iowa 2003) (holding report of alleged adverse activity under section 70A.28 must be to "public official," which did not include college dean).

On appeal, Carter continues to offer an opaque description of his whistleblowing activities, summarizing his position as follows: "Mr. Carter had a reasonable belief that Lee County mismanaged funds, engaged in fraud and cronyism, and endangered the public during its construction and maintenance of the new jail. Mr. Carter reported his reasonable beliefs to the Board of Directors and the Sheriff, and Mr. Carter was terminated for blowing the whistle."

After a careful and detailed analysis, the district court rejected the reasonableness of Carter's beliefs, concluding he "has established that he misunderstood several of the actions taken by the Board of Supervisors and that he disagreed with their actions. Merely disagreeing with their actions does not rise to the level of proving that the actions of Lee County would reasonably be perceived as some type of wrongdoing." We find no legal error in the district court's conclusion that voicing one's subjective disagreement with the actions of

one's supervisors is not whistleblowing. *See Blackburn v. United Parcel Service, Inc.*, 3 F. Supp. 2d 504, 517 (D.N.J. 1998) (finding New Jersey's far-reaching whistle blower statute was not intended to be a "chronic complainer act" and opining: "'Squeaky wheels' and 'pains in the ass' . . . are not protected classes under the Whistleblower Act."). The district court properly determined no reasonable jury could find Carter's venting of his complaints at the board of supervisor meetings merited protection under the whistleblower statute as the disclosure of information to a public official or law enforcement agency that he reasonably believed was evidence of a violation of a law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public safety or health.

Because we affirm the district court's grant of JNOV, Carter is not entitled to attorney fees under section 70A.29(3)(a).

**AFFIRMED.**

**DOYLE, J.** (dissenting)

Although the majority sets forth a well-written and insightful opinion, I must dissent. In view of the instructions given, there was substantial evidence in the record to support the jury's verdict. Therefore, the JNOV should not have been granted.

As noted by the majority, the introductory instruction provided to the jury states, in part:

> [Carter] alleges that his termination was wrongful because the [county] terminated him because he had *disclosed* information to a public official or law enforcement agency that he reasonably believed was evidence of a violation of the law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety. If this was the reason he was terminated, it was against public policy.
>      . . . .
>      Do not consider this summary as proof of any claim. Decide the facts from the evidence and apply the law, *which I now give you.*

(Emphasis added.) The use of the word "disclosed" in the summary above is consistent with the statutory language in Iowa Code section 70A.29(1) (2011), which is the basis of Carter's claim. But, this was not the law given to the jury to apply.

The marshalling instruction instructs the jury that in order for Carter to recover against the county on his claim of wrongful termination, he must prove, among other things, that he "*reported* certain information to a public official or law enforcement agency," and he "reasonably believed the information was evidence of [the county] committing a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or of a substantial and specific danger to public health or safety." (Emphasis added.) Unlike section 70A.29(1)'s specific

reference to an employee's "disclosure" of information, the instruction uses the word "report." Similarly, question two of the verdict form specifically asks the jury: "Did [Carter] make a *report* to a public official." (Emphasis added.)[4]

My review of the record shows no argument made by the county concerning the discrepancy between the statutory language and the language of the instruction and verdict form. It is well-established Iowa law that if a party does not object to an instruction, the instruction becomes the law of the case, even if the instruction misstated the law. *See, e.g.*, *Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 34 (Iowa 2014); *Pavone v. Kirke*, 801 N.W.2d 477, 489 (Iowa 2011); *Froman v. Perrin*, 213 N.W.2d 684, 689 (Iowa 1973); *Desmond v. Brown*, 33 Iowa 13, 16 (1871) ("If the plaintiff had asked an instruction explaining fully to the jury the legal meaning of the word . . . as applied to the circumstances of this case, and it had been refused, there might have been some ground for complaint. But we could not reverse, for the giving of the instruction complained of, without denying well-settled and elemental law."). Moreover:

> Even a timely objection to jury instructions will not avoid waiver of error if the objection is not sufficiently specific. The objecting party must specify the matter objected to and on what grounds. The objection must be sufficiently specific to alert the trial court to the basis of the complaint so that if error does exist the court may correct it before placing the case in the hands of the jury. And if the objection assails the sufficiency of the evidence supporting an instruction, it must specify that portion of the instruction lacking evidentiary support and the particular factual deficiency.

---

[4] I do note jury instruction thirteen states: "It is against the public policy of the state to discharge an employee for *disclosing* a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety." (Emphasis added.)

*Olson v. Sumpter*, 728 N.W.2d 844, 848-49 (Iowa 2007) (internal citations, alterations, and quotation marks omitted). Because the county did not raise any objection to the marshalling instruction's use of "reported" versus "disclosed," or the use of the word "report" versus "disclose" in the verdict form, "report" not "disclose" is the operative law of the case.

I do not disagree with the meaning given to the word "disclosure" by the majority, but the law of the case did not require a disclosure by Carter, it required only that Carter *reported* information to a public official or law enforcement agency. To "report" is "to give an account of." Webster's Third New Int'l Dictionary 728 (unabr. ed. 2002). Reporting is a more expansive activity than disclosing, for reporting may include revealing something hidden or unknown; but unlike disclosing, reporting does not require revealing or uncovering something unknown. *Compare id. with* The American Heritage Dictionary 402 (2d college ed. 1985) (defining "disclose" as stated in the majority's opinion). Under the instructions given, Carter had no duty to identify any information he had provided to the county supervisors or the sheriff that was previously unknown to them. There is substantial evidence in the record establishing Carter "reported certain information to a public official or law enforcement agency."

I do not disagree with the majority's interpretation of the statutory language "reasonably believes." However, I believe the evidence was sufficient to have the jury decide the question. "Reasonableness, of course, is a fact question." *Pirelli-Armstrong Tire Co. v. Reynolds*, 562 N.W.2d 433, 436 (Iowa 1997). The determination of whether an employee was "engaged in the protected activity" is a jury question, and therefore the question of whether Carter

was "reasonable in believing that a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial or specific danger to public health or safety existed or had occurred" was a question for the jury. *See Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 300 (Iowa 2013). I note the term "mismanagement," perhaps the broadest term in the subsection, is defined as "corrupt or improper management." Webster's Third New Int'l Dictionary 1444. "Abuse" is defined as a "departure from legal or reasonable use; misuse." Black's Law Dictionary 10 (9th ed. 2009).

Based upon Carter's testimony and ordinary definitions, I cannot say, viewing the evidence in the light most favorable to Carter, there was no evidence from which the jury could find that Carter was "reasonable in believing that a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial or specific danger to public health or safety existed or had occurred." This was the exact phrase given to the jury to determine, and they found Carter's beliefs reasonable. While the district court clearly did not find Carter's beliefs reasonable, and I might agree, we cannot, and should not, substitute our factual determination where eight jurors found otherwise. "The weight and credibility of testimony are matters for the jury," and "[t]his rule applies even though there are contradictions or inconsistencies in the testimony of a particular witness." *Becker v. D & E Distrib. Co.*, 247 N.W.2d 727, 730 (Iowa 1976). "A court cannot set aside a verdict just because it may have reached a different result," *In re Estate of Bayer*, 574 N.W.2d 667, 671 (Iowa 1998), and we are reluctant to interfere with jury verdicts. *See, e.g.*, *Trapalis v. Gershun*, 145 N.W.2d 591, 596 (Iowa 1966) ("The jury's verdict was within the evidence. It is

not for us to pass on the weight and credit of the testimony. That is what juries are for. While it appears that the jury was generous in its award . . . [w]e are reluctant to interfere under such circumstances.); *Slack v. Nease*, 124 N.W.2d 538, 541 (1963). A jury is allowed to settle disputed fact questions. *See Neumann v. Serv. Parts Headquarters*, 572 N.W.2d 175, 176 (Iowa Ct. App. 1997). In this case, the jurors chose to accept Carter's version of the facts, which at a minimum could be found to be "mismanagement" by the board. Consequently, the district court erred when it determined there was no evidence from which a reasonable person could find that Carter was "reasonable in believing that a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial or specific danger to public health or safety existed or had occurred."

No doubt Iowa's public employee whistleblower statute was not intended to be a "chronic complainer act" protecting "squeaky wheels" and "pain[s] in the ass." *See Blackburn v. United Parcel Serv., Inc.*, 3 F. Supp. 2d 504, 517 (D.N.J. 1998). Carter may have only been gadflying, to which there can be little dispute, but, the jury was not instructed to apply the statutory whistleblower language, and was therefore not required to find Carter was whistleblowing in order for him to recover. Because the jury affirmatively found, and substantial evidence supports, (1) Carter was "reasonable in believing that a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial or specific danger to public health or safety existed or had occurred"; (2) he made "a report to a public official or law enforcement agency official of evidence of a violation of law or rule, mismanagement, a gross abuse of funds, an abuse

of authority, or a substantial or specific danger to public health or safety"; (3) the report made by Carter was "the determining factor for a majority of the [Board's members'] decision to terminate his employment"; and (4) the county's "termination of [Carter's] employment a proximate cause of damages to [Carter]," the district court erred in granting the county's motion for JNOV. Accordingly, I would reverse the district court's ruling and reinstate the jury verdict and its damages award.